**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 17-6627**

UNITED STATES OF AMERICA,

                Petitioner - Appellee,

      v.

KAYLAN JAY BELL,

                Respondent - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Terrence W. Boyle, District Judge.  (5:16-hc-02204-BO)

Argued:  January 30, 2018                                   Decided:  March 12, 2018

Before NIEMEYER and TRAXLER, Circuit Judges, and SHEDD, Senior Circuit Judge.

Affirmed by published opinion.  Judge Traxler wrote the opinion in which Judge Niemeyer and Senior Judge Shedd joined.

**ARGUED:** Jaclyn Lee DiLauro, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant.  Christopher Michael Anderson, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF:** Louis C. Allen, Acting Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant.  Robert J. Higdon, Jr., United States Attorney, G. Norman Acker, III, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

TRAXLER, Circuit Judge:

Under the Adam Walsh Child Protection and Safety Act of 2006 (the "Act"), 18 U.S.C. §§ 4247-4248, the government may civilly commit a "sexually dangerous person" to the custody of the Attorney General upon the expiration of the person's prison sentence if the government proves by clear and convincing evidence that the person: (1) "has engaged or attempted to engage in sexually violent conduct or child molestation"; (2) "suffers from a serious mental illness, abnormality, or disorder"; and (3) as a result, "would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(5), (a)(6). Kaylan Bell appeals the district court's order finding him to be sexually dangerous under the Act. We affirm.

## I.

## A.

Bell is 33 years old. In 1999, when he was 14 years old, he sexually molested his six-year-old half-brother. He was convicted in juvenile court in Utah and received a sentence of suspended detention and counseling. When Bell was approximately 16 years old, he sexually molested his half-brother again and his six-year-old male cousin. Bell bribed his victims to engage in this sexual activity and to remain silent. He was not arrested or charged for these latter offenses. For much of this time, Bell had been placed in a youth home by his mother. However, Bell violated the rules by engaging in consensual sexual acts with peer-age males, and he was removed from the home.

In 2003, when Bell was 18 years old, he exposed his penis and masturbated in front of at least three 12-year-old boys in a pool locker room. Bell admitted to this conduct, but he was not arrested or charged.

In May 2004, Bell went to a field across from an elementary school and masturbated within 10 to 15 feet of six or seven small children. Bell admitted that he wanted the children to see him, and he hoped that they would come over and engage in a sexual act with him. Bell also admitted to a responding police officer that he had masturbated at the field as recently as one week prior to the incident and that he fantasized about sexual encounters with children. Bell was convicted in Utah state court of two counts of lewdness involving a child. He was sentenced to 24 months' probation.

On September 4, 2004, while on probation, Bell committed another sexual offense. He smoked marijuana and walked to an area near a school "looking to do something sexual with someone." J.A. 78. Bell saw two boys, ages 7 and 9, and "wanted to have sexual contact with the boys." J.A. 80. He approached the boys and, within 10 or 20 feet of them, "exposed [his] penis and masturbated in front of the boys." J.A. 80. When one of the boys asked the other, "'What do you want to do?'" Bell "exposed his erect penis and scrotum and said, 'You could play with this.'" J.A. 375-76. Bell was arrested and admitted "that he often fantasizes about anal and oral sex with boys, as well as fondling their genitals." J.A. 376. He was convicted of third-degree attempted sodomy on a child. While incarcerated in Utah state prison, Bell admitted to therapists that his urges were very strong and that he has violent fantasies, including one in which he "conclud[es] sex with a child by slitting the child's throat as he orgasm[s]." J.A. 376.

3

On December 9, 2009, Bell was released from state prison. Less than three months later, Bell targeted a 13-year-old boy that he saw in a grocery store and followed him, hoping to convince the boy to engage in a sexual act with him. Bell eventually gave up when it got too cold outside.

On June 1, 2010, Bell was arrested for failing to register as a sex offender, in violation of 18 U.S.C. § 2250(a), after moving from Utah to Idaho. He pled guilty and received a sentence of 42 months, followed by lifetime supervised release. During that proceeding, the district court observed that Bell "'poses a serious danger to children' and 'has begun to fantasize about kidnapping, molesting and then murdering young boys.'" J.A. 377. Given his "'documented history of interest and willingness to act on his urges,' and 'lack [of] impulse control,'" the district court observed that the "'danger [Bell] poses to the community is of paramount concern.'" J.A. 377.

On October 4, 2013, Bell was released to the community from his federal prison sentence. Among other things, Bell was required to abstain from using alcohol, take his prescribed medications, and participate in mental-health and sex-offender treatment. Bell was noncompliant. He drank alcohol, used drugs, failed to take his prescribed medications, failed to regularly appear for mental-health and sex-offender treatment sessions, and failed to comply with other conditions of his supervised release. Bell also admitted to his probation officer that he had been masturbating in public bathrooms to fantasies about prepubescent boys that he had seen in the community. Four months later, on February 5, 2014, Bell's supervised release was revoked for failing to comply with the conditions of his release. He was sentenced to 12 months in prison.

4

On February 4, 2015, Bell was released from federal prison for the second time under similar conditions of supervised release. Less than two weeks later, Bell skipped a scheduled meeting with his probation officer, purchased alcohol, walked to a nearby park where he had previously seen elementary school-age children playing, and quickly drank the alcohol. He located two boys, ages 11 and 13, and began watching them. When the boys walked to another location, Bell followed them. He exposed his penis to the children, began masturbating, and, with his penis in one hand, Bell opened his wallet, showed the boys money, and asked them to come over to him. When the boys refused, Bell moved closer. The boys threw rocks at Bell and told him (falsely) that they had a gun and would shoot him if he did not stop. Bell continued towards them, picked up a stick, and threatened to sodomize the boys with it. Bell left when an adult intervened, but was apprehended nearby. Bell's probation officer was notified and went to the scene to interview Bell and his victims. Bell admitted to most of the conduct, but denied threatening the boys. However, Bell also admitted that he was intoxicated, which alcohol testing confirmed. Bell pleaded guilty in state court to indecent exposure and was sentenced to 180 days in state prison. His federal supervised release was also revoked, for which he received an 18-month term of imprisonment.

B.

Bell's projected release date from federal prison was December 5, 2016. On August 17, 2016, the government initiated commitment proceedings by filing a certification that Bell was a sexually dangerous person within the meaning of the Act, staying his release.

At the commitment hearing, Bell admitted to the lion's share of his prior conduct. However, he denied that he was sexually attracted to prepubescent children and, despite earlier admissions to the contrary, denied that he fantasized about prepubescent children. He claimed that he was only attracted to older children (ages 13-17) and that he had mistakenly believed that his earlier victims were older than they actually were. The district court did not credit Bell's testimony. The district court pointed to evidence that Bell "masturbated to fantasies involving prepubescent children, and fantasized about violent sexual acts with them while in state prison," and "continued masturbating to pedophilic fantasies, sometimes using magazine pictures of boys, in federal prison and even while in sex offender treatment." J.A. 382-83.

Bell's mother testified at the hearing about her son and letters that he had written to her. For example, in 2014, Bell wrote to his mother that "he had tried to molest children," that "he had stopped children," and that "he had gone to church just for the purpose of trying to entice children so that he could molest them." J.A. 40. Bell also admitted to fantasizing about "devour[ing] humans of their flesh, bone, and blood," and to having "psychotic dreams with friends, family, and random people being butchered, raped, [and] beaten" by him. J.A. 42-43. Bell's mother testified that she knew that civil commitment would mean that Bell would have to remain in custody, but chose to testify "[s]o that [Bell] can get the help that he needs, so that he can be kept safe, and so children can be kept safe." J.A. 39.

Bell's federal probation officer also testified at the hearing. As noted above, Bell was noncompliant with his medication regime, failed to consistently attend his case

6

management appointments, and failed to consistently appear for his mental-health and sex-offender treatment sessions. In addition, Bell "was very concerned about his term of GPS monitoring" and "wanted to be released from the GPS monitoring as soon as possible." J.A. 139-40. He also failed to charge his GPS on a consistent basis. Bell continued to have deviant thoughts about sex with underage boys, which often included pain and blood, and masturbated to these deviant fantasies. According to the probation officer, Bell was the most impulsive person that she had ever supervised during her 20-year career in corrections. J.A. 148. She testified that the probation office had done "everything that we possibly could to help Mr. Bell and still his non-compliant behavior escalated throughout the course of each term of supervision. And we were fortunate here that the sex offense violation that was committed [in 2015] wasn't more severe." J.A. 167.

Three mental health experts also testified at the hearing. Rebecca Barnette, Ph.D., evaluated Bell on behalf of the Bureau of Prisons, and Mark Hastings, Ph.D., was appointed by the district court to evaluate Bell. Both opined that Bell suffered from Pedophilia along with several other disorders. Prior to Bell's earlier terms of supervised release, Dr. Barnette had concluded that Bell met the first two prongs of the certification requirements, but not the third prong. In her more recent review, however, Dr. Barnette concluded that Bell's escalated attempt at child molestation, combined with the other indicators of his lack of impulse control, demonstrated that he was sexually dangerous to others. Dr. Hastings agreed. Joseph Plaud, Ph.D., evaluated Bell at the request of Bell's

7

counsel. He testified that Bell was not a pedophile and would not have serious difficulty refraining from molesting a child if released.

The district court found that the government had established by clear and convincing evidence that Bell was sexually dangerous. With regard to the first prong, the district court found that [Bell] has attempted to engage in child molestation." J.A. 380. In addition, the district court noted that "[a]ll of the experts agree[d] that [Bell] engaged in child molestation by virtue of at least his 1999 conviction for molesting his brother" and Bell did "not dispute that the government ha[d] proven the first element." J.A. 380.

With regard to the second prong, the district court credited the opinions of Drs. Barnette and Hastings over that of Dr. Plaud, and found that the government had "met its burden to show that [Bell] suffers from Pedophilic Disorder, which constitutes a serious mental illness, abnormality, or disorder under the Act." J.A. 385. Among other things, the district court noted Bell's history of acting on his sexual urges towards prepubescent children, which began when he was a teenager and continued through his most recent offense in 2015, his ongoing masturbation to fantasies involving the sexual molestation of prepubescent children, and his violent sexual fantasies or dreams about such children. The diagnosis was also supported by penile plethysmograph ("PPG") "testing in 2005 that showed [Bell's] sexual arousal to infant males, 5-year-old males, and 10-year-old males; PPG testing in 2012 that used both audio and visual stimuli and that showed clinically significant sexual arousal to grammar-school-age males," a Screening Scale for Pedophilic Interest "administered by Dr. Hastings in 2016 on which [Bell] received the highest possible score," and "a 2005 psychological evaluation concluding that [Bell]

8

exhibits pedophilic interest, and virtually an obsession over sexual contact with children."

J.A. 383 (internal quotation marks and citations omitted). In addition, the district court

found that Bell suffered from Borderline Personality Disorder, Alcohol Use Disorder,

Cannabis Use Disorder, Borderline Intellectual Functioning Disorder, and Unspecified

Schizophrenia Spectrum and Other Psychotic Disorder.

With regard to the third prong, the district court again credited the opinions of Drs.

Barnette and Hastings over that of Dr. Plaud, and found that Bell would have serious

difficulty in refraining from sexually violent conduct or child molestation if released from

custody. First, the district court found that Bell's mental illnesses had clearly reduced his

ability to control his behavior:

> [Bell] suffers from strong pedophilic fixations and fantasies, as well as a marked impulsivity and lack of self-regulation. These problems are compounded by [Bell]'s substance abuse and are reinforced through his lack of ability or motivation to curb his urges. Additionally, [Bell] encourages and succumbs to his sexual desires through masturbation to fantasies of children and by seeking out areas to watch and approach children, even knowing of the high risk of punishment for such conduct. [Bell]'s pedophilic urges have therefore, despite external consequences and the passage of time, not abated but have continued to be manifested through masturbation, violent fantasies, and stalking and exposure behavior, even during incarceration, while in treatment, and even while on supervision in the community.
>
> The Court also finds it important to note that . . . [Bell]'s pedophilic urges and fixations have manifested themselves in what are often violent and distressing fantasies or dreams. [Bell] has admitted several times to having such violent sexual fantasies or dreams about children, including fantasies in which he kidnaps, murders, or violently rapes children. Though [Bell] has admitted to these fantasies to therapists and though he has expressed distress and regret over having them, the record does not show that [Bell] has meaningfully or consciously taken steps that would help him control or reduce such fantasies or dreams of violence.

9

J.A. 387-88. Second, the district court found that Bell's inability to control his behavior was demonstrated by his prior offenses, recidivism, and supervised release violations.

> [R]espondent has a significant history of sexual reoffending, beginning when he was 14 and continuing today to the age of 32, such that, in the past ten years, [Bell] has spent less than one year in the community. Each sexual offense has largely followed the same pattern: [Bell] is released, fails to follow the conditions of supervision, and within a few months or even weeks has committed a sexual offense in the presence of young children. And, a[s] Drs. Barnette and Hastings discussed, those offenses have involved escalating conduct, culminating in his most recent offense during which he tried to entice two boys with money to engage in sexual behavior in a public park, stalked the boys despite threats of physical violence, and threatened to sodomize the boys with a stick. [Bell]'s lack of volitional control is also shown by his pattern o[f] noncompliance under supervision. He has been unable to comply with the requirements of supervision, including requirements that would help him manage his urges such as refraining from alcohol and drugs or attending therapy. Moreover, the record shows that [Bell] has had trouble controlling his behavior even while incarcerated. The record show[s] 15 violations while in state prison, including at least one sex act violation. While in federal prison, [Bell] committed additional violations, including violations for the use of drugs and sexual activity.

J.A. 388-89. There was also evidence of Bell's cognitive distortions "in which he has excused or justified his conduct, including by denying planning and identifying himself as a victim as well." J.A. 390.

Third, the district court noted that Bell's actuarial sex-offender risk assessment scores were high. "Compared to other adult male sex offenders, [Bell]'s Static-99R and Static-2002R scores place[d] him in the 99.99th percentile, and the sexual recidivism rate of sex offenders with the same score as [Bell] is expected to be approximately 7.32 and 6.90 times higher than the recidivism rate of the typical sexual offender, depending on the test." J.A. 389.

10

And finally, the district court found it significant that Bell had "admitted many times in the past to needing help and not being able to control his urges," including as recently as 2016, when Bell admitted that he was "not ready for release to the community and that he desperately needs sex offender treatment." J.A. 390 (internal quotation marks omitted). However, Bell lacked "a history of effective or successful participation in treatment, despite many chances," J.A. 390, which "was likely due, at least in part, to ambivalence about changing [his] problematic behaviors," J.A. 391 (internal quotation marks omitted). "[C]onsequently, [Bell] reoffended sexually despite participation in sex offender treatment at ages 17, 18, 27, 28, and 29." J.A. 391. In addition, Bell lacked protective factors in his life. He "has little family or emotional support" and "supervision was not effective at helping him maintain discipline." J.A. 391.

## II.

In an appeal from an order granting civil commitment under the Act, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *See United States v. Wooden*, 693 F.3d 440, 451 (4th Cir. 2012). A reviewing court "may not reverse a lower court's finding of fact simply because it would have decided the case differently. Rather, a reviewing court must ask whether, on the entire evidence, it is left with the definite and firm conviction that a mistake has been committed." *Id.* (internal quotation marks and alteration omitted). Moreover, when a district court's findings of fact are based on credibility determinations, we accord "even greater deference to the trial court's findings." *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012) (internal quotation marks omitted). We are "especially reluctant to set aside a finding based on the

11

trial court's evaluation of conflicting expert testimony." *Id.* (internal quotation marks omitted). "Evaluating the credibility of experts and the value of their opinions is a function best committed to the district courts, and one to which appellate courts must defer." *United States v. Heyer*, 740 F.3d 284, 292 (4th Cir. 2014) (internal quotation marks and alteration omitted).

## III.

On appeal, Bell does not dispute the district court's findings that he has previously engaged and attempted to engage in acts of child molestation, and that he suffers from Pedophilia, which is a serious mental illness, abnormality, or disorder. Rather, he challenges the district court's finding that, as a result of his mental illnesses, he would have serious difficulty in refraining from child molestation if released.

## A.

Bell first argues that, *as a matter of law,* the government could not establish by clear and convincing evidence that he would have serious difficulty refraining from child molestation because he has not committed a hands-on child molestation offense since he was a juvenile and his exposure offenses as an adult do not independently rise to the level of child molestation or sexually violent conduct. We disagree.

First, the Act plainly does not require the government to prove that a person has committed a *hands-on* child molestation or sexually violent offense as an adult to prove, by clear and convincing evidence, that he would have serious difficulty refraining from doing so if released from custody. Nor, obviously, must the person have been successful in his attempts to commit such an offense in order to be found sexually dangerous to

12

others. On the contrary, the first prong of the sexual dangerousness inquiry requires the government to prove that the inmate "has engaged *or attempted to engage* in sexually violent conduct or child molestation." 18 U.S.C. § 4247(a)(5) (emphasis added). And the third prong requires the government to prove that, as a result of a serious mental illness or disorder, the inmate "would have serious difficulty in *refraining* from sexually violent conduct or child molestation if released" from custody. *Id.* § 4247(a)(6) (emphasis added).

The "serious difficulty" inquiry "refers to the degree of the person's volitional impairment, which impacts the person's ability to refrain from acting upon his deviant sexual interests." *Hall*, 664 F.3d at 463 (internal quotation marks omitted). Although consideration of the inmate's criminal record is a critical part of the analysis, the core question is whether the government has presented "sufficient evidence of an *ongoing volitional impairment*" that renders the person sexually dangerous to others. *United States v. Antone*, 742 F.3d 151, 168 (4th Cir. 2014). A number of other factors are also considered, including the offender's age, his actuarial test scores, his participation in treatment, his commitment to controlling his deviant behavior, and his ability to control his impulses. *See Hall*, 664 F.3d at 464. The individual's resistance to treatment, continuing "deviant sexual thoughts," and "cognitive distortions and thinking errors about the appropriateness of children as sexual partners" are also relevant. *Wooden*, 693 F.3d at 462.

In this case, there is no evidence that Bell has been *successful* in his attempts to commit a hands-on child molestation offense during the narrow periods of time that he

13

has been returned to the community as an adult. But there is no question that the government has presented clear and convincing evidence of Bell's "ongoing volitional impairment." *Antone*, 742 F.3d at 168 (emphasis omitted). Bell has demonstrated an inability "to refrain from acting upon his deviant sexual interests" time and time again. *Hall*, 664 F.3d at 463.

Second, the district court did not reach the conclusion that mere exposure offenses, without more, rise to the level of child molestation for purposes of the Act. Rather, the district court properly evaluated the totality of Bell's diagnoses, his prior sexual offenses, and the other notable and numerous indicators of his lack of volitional control, and reached the reasonable conclusion, based upon the clear and convincing evidence, that Bell was sexually dangerous to children and should not be released from custody. In doing so, the district court specifically addressed Bell's argument that his adult offenses were merely "exhibitionism" offenses that cannot be not be considered sexually dangerous conduct, but found that Bell's "conduct should [not] be characterized so mildly." J.A. 391.

> First, [Bell] has demonstrated a marked pattern of approaching and targeting children. Even after serving severe consequences throughout his adult life for such conduct, nearly each time when released [Bell] has promptly reoffended in the same manner. This indicates that [Bell] has a difficulty controlling his sexual behavior. Second, *that behavior, while not involving hands-on contact as an adult, has exhibited a pattern of escalating conduct, increasingly threatening actions, and what the Court finds to be several attempts at hands-on contact.* Several times while exposing himself, [Bell] asked children to approach him or offered sex to those children. [Bell]'s most recent offense involved enticement and threats of violence to children that [Bell] had approached and exposed himself to, all while in public and at a high risk of once again facing criminal consequences. This all indicates to the Court that, despite years of

14

incarceration, targeted therapy, close monitoring while on probation, and even after being assessed twice for commitment under this Act, [Bell] still was unable to curb his behavior and refrain from the very conduct which has landed him in trouble time and time again. *The court finds that [Bell]'s conduct has crossed the line from merely exhibitionism to enticement, that [Bell]'s own actions and words demonstrate that he was attempting more than to simply expose himself, and that [Bell] has shown himself to be a high risk for targeting and enticing children for molestation.*

J.A. 391-92 (emphasis added). We agree, and we find no error in the district court's rejection of Bell's claim that, as a matter of law, his adult sexual offenses cannot be considered sexually dangerous conduct for purposes of the Act.

B.

In a slightly different presentation of his argument, Bell next contends that the district court *clearly erred* in finding that he would have serious difficulty refraining from acts of child molestation. Specifically, Bell argues that the district court failed to properly account for the 18-year gap since his last, successful hands-on offense, as well as the 10-year gap between his May 2004 and February 2015 sexual offenses. According to Bell, these temporal gaps prove that he can control his impulses.

We find no merit to this claim either. The district court exhaustively reviewed the evidence and testimony presented, including the history of Bell's sexual offenses and his long periods of intermittent incarceration, credited the expert opinions of Drs. Barnette and Hastings, and found that Bell lacked the volitional control necessary to be safely returned to the community. Although the district court was aware of the temporal gaps between Bell's sexual offenses in the community, the court was unpersuaded that these gaps demonstrate Bell's ability to control his impulses. On the contrary, Bell's lack of

15

volitional control had been "demonstrated . . . by his historical offenses, recidivism, and failures while on supervision" in the community. J.A. 388. As the district court observed, "[Bell] has a significant history of sexual reoffending, beginning when he was 14 and continuing today to the age of 32, *such that, in the past ten years, [Bell] has spent less than one year in the community.* Each sexual offense has largely followed the same pattern: [Bell] is released, fails to follow the conditions of supervision, and within a few months or even weeks has committed a sexual offense in the presence of young children." J.A. 388-89 (emphasis added).

We find no error in the district court's decision to credit the testimony of Drs. Barnette and Hastings regarding Bell's sexual dangerousness, and no clear error in the district court's other factual findings.

C.

Bell's final claim is that the district court erred in crediting Dr. Barnette's opinion the he was sexually dangerous because Dr. Barnette had twice declined to reach that conclusion in prior evaluations of Bell. We disagree.

Dr. Barnette's first evaluation of Bell was in 2013, just prior to his release from federal prison after his failure-to-register conviction. At the time, she was concerned about Bell's conduct, but felt that the temporal distance from his most recent sexual offense, and stringent supervised-released conditions, weighed against finding that he met the requirements for civil commitment. Dr. Barnette's second evaluation of Bell was in 2014, after his supervised release was revoked for his failure to comply with the conditions of his release. Although Dr. Barnette remained concerned, she declined to

16

find that Bell was sexually dangerous because there was no evidence that he had approached or molested a child during the four months that he was on supervised release.

Not so at the time of Dr. Barnette's third evaluation. Contrary to Bell's claim, Dr. Barnette did not change her opinion in the absence of any relevant new facts or circumstances. "[W]hat changed my opinion," Dr. Barnette testified, "was Mr. Bell's behavior when he was released from prison during his last time." J.A. 213. Despite nearly daily contact with his probation officer, the threat posed by his two prior referrals for evaluation under the Act, and two "opportunities in the community," Bell had "re-offended sexually within two weeks of his release." J.A. 213-14. Moreover, Bell's "offense conduct was an escalation of the exposures that were committed in 2004, in that he followed the children, enticed the children with money, which [was] consistent with his [previous] hands-on offense patterns, that he would bribe his cousin and his brother to engage in sexual activity with him, and that he threatened the children, and that, ultimately, he did not leave the children alone until an adult intervened and was going to call authorities on Mr. Bell." J.A. 214. In sum, Dr. Barnette adequately explained why Bell's conduct led her to a different conclusion and we find no error in the district court's decision to rely upon it.

IV.

For the foregoing reasons, we affirm the judgment of the district court.

*AFFIRMED*

17