**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 22-6464**

─────────────

UNITED STATES OF AMERICA,

Petitioner - Appellee,

v.

NATHANIEL WILLIAMS,

Respondent - Appellant.

─────────────

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. W. Earl Britt, Senior District Judge. (5:21-hc-02244-BR)

─────────────

Argued:  September 14, 2022                     Decided:  November 17, 2022

─────────────

Before RICHARDSON and HEYTENS, Circuit Judges, and MOTZ, Senior Circuit Judge.

─────────────

Vacated and remanded by published opinion. Judge Heytens wrote the opinion, in which Senior Judge Motz joined. Judge Richardson wrote a dissenting opinion.

─────────────

**ARGUED:** Jennifer Claire Leisten, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Genna Danelle Petre, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** G. Alan DuBois, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant. Michael F. Easley, Jr., United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

─────────────

TOBY HEYTENS, Circuit Judge:

Federal prisoners on the cusp of being released may be civilly committed if they are "presently suffering from a mental disease or defect as a result of which [their] release would create a substantial risk" to the person or property of others. 18 U.S.C. § 4246(d). Here, the primary question is whether—in making such a risk assessment—a court must consider any terms of supervision that would govern the prisoner's conduct post release. The answer, we hold, is yes. And because the record offers no assurances the district court appropriately considered the terms of Nathaniel Williams' supervised release before ordering him committed, we vacate the court's order and remand for further proceedings.

I.

A.

Williams has long struggled with mental illness and a proclivity to violent outbursts. In 2017, Williams assaulted a security guard in Portland, Oregon—a federal crime because it happened at a Social Security office. See 18 U.S.C. § 111(a)(1). Williams pleaded guilty and was sentenced to just over four years in prison, to be followed by three years of supervised release. The sentencing court imposed 13 standard and 14 special conditions of supervised release, including that Williams "must take all mental health medications that are prescribed by [his] treating physician" and "must participate in a mental health treatment program." JA 128.

For several years, Williams did not fare well in federal custody. In March 2019, he was transferred to a medical center in Minnesota after failing to take medication, experiencing mania and hallucinations, and assaulting his cellmate. Even after the transfer,

2

Williams continued to rack up incident reports and failed to reliably take prescribed medication. After more than a year of new incidents—and Williams' formal request to withdraw from voluntary mental health treatment—the government successfully petitioned to have Williams hospitalized under 18 U.S.C. § 4245, which permits the involuntary transfer of a federal prisoner who "is presently suffering from a mental disease or defect" "to a suitable facility for care and treatment." § 4245(a) & (d).

Having secured the involuntary hospitalization order, Bureau of Prisons officials concluded Williams met the constitutional and regulatory criteria for involuntary medication. See *Washington v. Harper*, 494 U.S. 210 (1990); 28 C.F.R. § 549.46(a)(5) & (b). In June 2021, Williams began receiving monthly injections of Haldol, which "psychiatrically stabilized" Williams and "remitt[ed]" his symptoms. JA 43, 47. Since starting Haldol injections, Williams has engaged in no violent behavior.

Three months before Williams' custodial sentence was set to expire, the Bureau of Prisons transferred him to a specialized facility in North Carolina to assess whether he could be safely released. The evaluating psychologist acknowledged that, at the time of intake, Williams displayed no overt signs of a formal thought or mood disorder and his medications had largely remitted his past symptoms. The evaluating psychologist, though, concluded that releasing Williams would create a substantial risk of injury to people or property because she thought Williams would stop taking his medication, which would, in turn, render him dangerous to others.

3

B.

Less than two weeks before Williams' scheduled release, the government asked a district court in North Carolina (commitment court) to order him civilly committed. The government's request automatically stayed Williams' release, see 18 U.S.C. § 4246(a), and the commitment court held a hearing at which Williams, the evaluating psychologist, and a psychiatrist selected by Williams testified. Williams also provided the judgment of the sentencing court, which included the terms of his supervised release.

During the hearing, several points of common ground emerged. First, Williams suffers from schizoaffective disorder, bipolar type, which is in partial or full remission. Second, Williams has a history of seemingly indiscriminate acts of violence when unmedicated. Third, while on his current medication—which he had been taking for more than nine months on an involuntary basis at the time of the hearing—Williams poses no substantial threat to others.

The issue thus came down to whether Williams was likely to continue taking his medication if released. See JA 115 (commitment court stating, "I don't think the Government would dispute" that Williams is "not a danger as long as he complies with his medication"). Williams acknowledged his past failures to take prescribed medication but testified he enjoyed the effects of Haldol, wanted to keep taking it, and likely would be reincarcerated if he failed to do so. By contrast, the evaluating psychologist concluded Williams was unlikely to keep taking his medication if released, citing his earlier probation violations, past inability to stick to medications, and lack of insight into the seriousness of his mental illness.

4

After the parties presented their evidence, the commitment court asked whether it could order Williams' release under "conditions which would assure his lack of dangerousness," JA 116, and recessed the hearing so the parties could formulate positions on the matter. When the hearing resumed, the parties agreed that a court considering whether to halt a person's release under Section 4246(d) may not impose new conditions without first committing the person to the custody of the Attorney General.

The parties diverged, however, on whether the commitment court should consider the terms of supervised release imposed by the sentencing court. Williams urged the commitment court to do so, noting that his terms of supervised release included "numerous conditions that directly speak to the [commitment court's] concerns." JA 136. Williams particularly emphasized terms requiring him "to sign a waiver that allows the probation officer to receive all medical information" and thus verify "if he took his [Haldol] shot." JA 136–37. By contrast, the government insisted that "[t]he supervised release conditions should not impact [the commitment court's] decision." JA 149. Indeed, the government asserted the commitment court should not even "consider" those conditions because "we cannot base our determination on the actions of another court." *Id*.

At the end of the hearing, the commitment court orally granted the government's request to commit Williams to the custody of the Attorney General. Consistent with the parties' agreement, the court determined it lacked authority "to order a conditional release of a person who has not been committed . . . under the statute." JA 154. The commitment court briefly referenced Williams' arguments about the conditions of his supervised release:

The supervised release you face under your criminal judgment is of a limited duration and is subject to the control of some other court that does not have both your best interest and the mental health of you and others like you and the safety of the public, and that may be a little harsh.

Even if the Court does have that thought in mind or that goal in mind, the Court's authority to impose conditions on you is very limited. The Court is working there in the state of Oregon in the Federal United States District Court for the District of Oregon with a three-year term of supervised release. I don't know how much of that has already expired. I don't know any way at all that it can be extended.

JA 157.

Six days later, the commitment court issued a written order memorializing its decision. The order reiterated Williams' release would pose a danger only "if he is unmedicated," JA 162, and acknowledged the parties' differing positions about the relevance of Williams' supervised release. See JA 161 (noting that Williams "argues that the conditions of supervised release imposed in his criminal case, to which he would be subject if he were not committed, mitigate any risk of danger," whereas "[t]he government contends that [Williams'] supervised release terms should not impact this court's determination"). The order did not comment on the persuasiveness of these arguments, nor did it explain whether—or how—Williams' supervised release factored into the commitment court's decision. We review the district court's factual findings for clear error and its legal analysis de novo. *United States v. Bell*, 884 F.3d 500, 507 (4th Cir. 2018).

## II.

Repeating its position before the commitment court, the government at first insisted on appeal that a commitment court need not—and perhaps even may not—consider "any term of supervised release" imposed by a sentencing court. Gov't Br. 34. Although the

6

government walked back its claim somewhat during oral argument, we reject that view in all its forms.

We start, as always, with the statutory text. Section 4246(d) does not authorize the involuntary commitment of any person "suffering from a mental disease or defect" or one whose "mental disease or defect" could pose a danger to others under some circumstances. 18 U.S.C. § 4246(d). Instead, the statute mandates a predictive assessment, providing commitment may be ordered only if, "after [a] hearing, the court finds by clear and convincing evidence that" the person's "release *would create* a substantial risk of bodily injury to another person or serious damage to property of another." *Id.* (emphasis added). As the government elsewhere recognizes, this standard "requires the court to consider all the evidence presented and determine whether the person's release would endanger the public." Gov't Br. 49. The statutory text does not permit—much less instruct—a commitment court to pretend that the person will not be subject to terms of supervision imposed by the sentencing court and conduct a thought experiment about whether the same person would likely endanger others if not so constrained. Nor would such an approach afford appropriate solicitude to the serious liberty interests imposed by continuing to detain a person whose term of imprisonment has ended. See generally *Addington v. Texas*, 441 U.S. 418 (1979).

Perhaps for this reason, this Court regularly considers the length and terms of a person's supervised release—and the person's history of compliance with court-imposed supervision—in reviewing a commitment analysis. See, *e.g.*, *United States v. Antone*, 742 F.3d 151, 164 (4th Cir. 2014); *United States v. Bolander*, 722 F.3d 199, 215 (4th Cir.

2013); *United States v. Francis*, 686 F.3d 265, 271 (4th Cir. 2012). Doing so makes perfect sense. Because a basic aim of a commitment analysis is to predict whether a person would pose a substantial risk to others if released, any restrictions imposed by the sentencing court—which are themselves designed to protect the public upon the person's release, see 18 U.S.C. §§ 3583, 3553—are inherently relevant.

That is not to say, of course, that anyone who would otherwise be on supervised release may not be committed under Section 4246(d) or that a commitment court must invariably recite every condition imposed by the sentencing court and explain why it cannot protect public safety. In *United States v. Bell*, 884 F.3d 500 (4th Cir. 2018), this Court affirmed a commitment order under a different statute—18 U.S.C. § 4248—even though the person at issue was already subject to a lifetime term of supervised release. See 884 F.3d at 503. In *Bell*, however, the commitment court specifically weighed the defendant's supervision, but found it insufficient to protect the public given a probation officer's testimony that the defendant was "the most impulsive person that she had ever supervised during her 20-year career" and the defendant's "non-compliant behavior escalated throughout the course of each term of supervision." *Id.* at 505.

Nor do we establish any hard floor for a required explanation. Less exhaustive treatment may be appropriate, for example, when any future supervision would be minimal or not directed at a person's primary risk factors, or when the terms of supervised release are not a crucial component of one party's arguments about the appropriateness of commitment. See *United States v. Wooden*, 887 F.3d 591, 606–07 (4th Cir. 2018)

8

(rejecting notion that "the court must explain in detail why it rejects each and every individual piece of evidence").

But here the fact and nature of Williams' supervised release was no ancillary matter. Rather, it constituted Williams' primary argument against commitment—an argument the government insisted should be ignored and about which the commitment court said precious little. Indeed, the commitment court said nothing about the *terms* of Williams' supervised release, even those directly addressing the central issue in dispute: Would Williams keep taking his medication following any release? See JA 128 (providing that Williams "must participate in a mental health treatment program" and "take all mental health medications that are prescribed by [his] treating physician"). Whether or not the terms of supervision the sentencing court imposed were ultimately enough to ensure Williams' safe release, the commitment court was "required to at least consider the evidence, and account for it, when concluding otherwise." *United States v. Wooden*, 693 F.3d 440, 454 (4th Cir. 2012).

Indeed, the commitment court's handful of references to the fact of Williams' supervised release suggest the court gave no weight to its specific terms. The court's first nod to supervised release came during the initial hearing, after it requested "research" on whether commitment under Section 4246 was warranted if Williams' "unconditional release" would pose a substantial risk. JA 115. The government's lawyer sought clarification, asking whether the court wanted to know if it could impose new terms on Williams' release or was instead referring to the "term of supervised release that has been

9

imposed by [the sentencing] court." JA 116. The commitment court responded: "Doesn't have anything to do with the term of supervised release." *Id*.

The commitment court's next mention of supervised release came as it was orally explaining why it had ordered Williams committed. Here too, the court's remarks do not show it analyzed the substance of Williams' conditions of supervision or identified a permissible reason to minimize the conditions' weight.

Take the commitment court's statement that Williams' "three-year term of supervised release" "is of a limited duration." JA 157. For one thing, that reference to the length of Williams' supervised release says little about whether the court gave any consideration to whether its terms would lessen Williams' dangerousness—at least so long as the conditions remained in effect.

At any rate, the commitment court admitted knowing little about how long Williams would spend on supervised release, stating it did not "know how much of [the supervised release term] has already expired" or whether there was "any way at all that it can be extended." JA 157. Before us, the parties hotly dispute several related matters, including how much supervised release time remains and whether it would have been permissible for the commitment court to order Williams committed today based on risks that may not materialize (if at all) for up to three years after this Court's ruling. It is far from clear whether these various issues were aired before the commitment court, and the commitment court did not purport to resolve them. Accordingly, we decline to consider whether the commitment court's decision might have survived appellate review had it done so.

10

That leaves the commitment court's observation that Williams' supervised release "is subject to the control of some other court" and its brief remarks about the ability of the sentencing court to regulate Williams' conduct and protect public safety during his supervised release. JA 157. We have already explained why any conditions of supervised release are relevant to whether a person should be committed, and the fact that such conditions were imposed or would be enforced by "some other court" does not change the analysis. (Indeed, the sentencing and commitment courts will often differ because the former will almost always be in the geographic area of the underlying crime, see generally U.S. Const. amend. VI, while the latter must be where the inmate is detained—including, as was true here, for psychiatric evaluation or treatment, see 18 U.S.C. § 4246(a)).

What is more, sentencing courts—including the federal district court that sentenced Williams—must consider public safety and a defendant's well-being when selecting a term of incarceration and imposing conditions of supervised release. See 18 U.S.C. §§ 3583(c), 3553(a). To fulfill that duty, federal law grants sentencing courts broad authority to fashion appropriately tailored terms of supervision, including the 14 special conditions imposed here. See 18 U.S.C. § 3583(d); *United States v. Magdaleno*, 43 F.4th 1215, 1222–23 (9th Cir. 2022); *United States v. Douglas*, 850 F.3d 660, 663 (4th Cir. 2017). Accordingly, any reliance on a belief that the sentencing court's "authority to impose conditions on [Williams] is very limited," JA 157, would constitute legal error.

The commitment court's written order also fails to illuminate its reasons for rejecting Williams' arguments about the terms of his supervised release. To be sure, the commitment court did not expressly endorse the government's claim "that [Williams']

11

supervised release terms should not impact th[e] court's determination," JA 161, or that the court should not even "consider" them, JA 149. At the same time, however, the commitment court's written order never directly addressed Williams' assertion "that the conditions of supervised release imposed in his criminal case . . . mitigate any risk of danger." JA 161. So, once again, the record is silent about whether the commitment court gave any weight to the conditions of supervised release to which Williams would be subject if it denied the government's commitment petition and, if so, why it still concluded Williams should be committed.

*      *      *

Refusing to release a person who has served a criminal sentence based on a prediction that it would be too dangerous to do so is serious business. Before prolonging a person's loss of liberty under Section 4246, courts must consider all evidence bearing on the issue, including whether and how well other preexisting restrictions on the person's conduct (including an unserved term of supervised release) could reduce the risks posed by the person's release. Because the record leaves us unable to tell whether the district court appropriately considered the terms of Williams' supervised release, we vacate the commitment order and remand for further proceedings.

*SO ORDERED*

12

RICHARDSON, Circuit Judge, dissenting:

The majority and I largely agree. Williams suffers from bipolar type schizoaffective disorder. When he is taking his medicine, he's fine. But when he's off his medicine, he's dangerous. As a federal inmate, Williams sometimes took medication and other times would not. When the district court held its commitment hearing, Williams had been taking his medication for about a year. But, during that year, he had no choice in the matter. And he had recently asserted that he did not need medication all the time, only as needed. So the district court had to make a tough predictive judgment: Would Williams keep taking his medicine if released from federal custody? Based on the evidence in front of it, the court predicted that he would not. It thus held that Williams was highly likely to pose a substantial risk to others and civilly committed Williams under § 4246. So far, so good.

But the majority says that—even assuming the district court had sufficient evidence to support its answer—the court didn't show enough of its work to get credit. That is where we part ways.

I wholeheartedly agree that the district court needed to consider Williams's preexisting supervised release when predicting the risk he posed. But, from my reading of the record, the district court did just that. During a hearing, Williams's attorney argued at length that his supervised release conditions were enough to mitigate his danger. The district court rejected that argument, reasoning that the supervised release terms were "of a limited duration." J.A. 157. The district court also expressed concern that—even while they were in place—Williams's existing supervision might not adequately mitigate his risk. *See* J.A. 157 (noting Williams's release conditions were "subject to the control of some

13

other court").[1]  The court continued:  "I don't know how much of that has already expired. I don't know any way at all that it can be extended."  J.A. 157.

To my eyes, the district court's discussion revealed a concern that, once Williams's supervised release conditions ended—whenever precisely that would be[2]—he would once again stop taking his medication, as he had many times in the past.  And, just like those past instances, once he became unmedicated, he would become violent and dangerous.  So it's technically true to say that the district court "said nothing about the [specific] *terms* of Williams' supervised release," or whether those terms would render Williams safe "at least so long as the conditions remained in effect."  Majority at 9, 10.  But the district court did not need to discuss those questions because its decision rested on a far more fundamental problem:  Whatever the terms were, they were ending soon.  And so whatever protection they provided would soon end as well.

The district court's finding that Williams was highly likely to pose a substantial risk to others is entitled to very deferential review.  The majority repeats the refrain that a district court need not "explain in detail why it rejects each and every individual piece of evidence."  Majority at 9 (quoting *United States v. Wooden*, 887 F.3d 591, 607 (4th Cir.

---

[1] Indeed, the record reflects Williams had skirted court-ordered supervision before. So it makes sense that the district court was worried that he might do so again.  But even if this time might be different, Williams's supervision is still of limited duration. Whatever protection it provides will end in just a few years.

[2] The majority notes that the parties "hotly dispute . . . how much supervised release time remains."  Majority at 10.  And, in the hearing, the district court acknowledged that it did not know how much of the three-year term was left.  But the point is that the term would eventually expire:  not next decade, but soon.

14

2018)).  Yet that promise rings hollow here.  The district court did enough given the inherent challenges with predicting the future risk someone will pose.  I respectfully dissent.