**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-6071**

---

UNITED STATES OF AMERICA,

Petitioner - Appellee,

v.

MICHAEL JOSEPH HODGE,

Respondent - Appellant.

---

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Louise W. Flanagan, District Judge.  (5:21-hc-02217-FL)

---

Submitted:  April 30, 2024                              Decided:  July 31, 2024

---

Before AGEE and THACKER, Circuit Judges, and TRAXLER, Senior Circuit Judge.

---

Affirmed by unpublished per curiam opinion.

---

**ON BRIEF:**  G. Alan DuBois, Federal Public Defender, Jaclyn L. Tarlton, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant.  Michael F. Easley, Jr., United States Attorney, Holly P. Pratesi, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

In 2002, Michael Hodge pleaded guilty in the Eastern District of Virginia to distribution of child pornography. He was sentenced to 288 months' imprisonment, to be followed by five years' supervised release. At the time of his federal offense, Hodge was on parole for a Virginia sexual-assault offense; the commission of the federal offense violated the conditions of his state parole.

As Hodge approached the end of his 288-month sentence, the government filed a petition certifying him as a sexually dangerous person and seeking civil commitment under 18 U.S.C. § 4248. After a hearing, the district court granted the petition, concluding that the government had proven by clear and convincing evidence that Hodge met the criteria for commitment. Hodge appeals. He contends that the district court failed to give proper consideration to the existing constraints on his liberty—the conditions of supervised release for his federal offense and the Virginia parole detainer—to which he would be subject if he were not civilly committed. *See United States v. Williams*, 53 F.4th 825 (4th Cir. 2022). Finding no reversible error, we affirm.

## I.

In order to commit Hodge as a sexually dangerous person, the government was required to prove by clear and convincing evidence that Hodge (1) previously "engaged or attempted to engage in sexually violent conduct or child molestation," 18 U.S.C. § 4247(a)(5); (2) "suffers from a serious mental illness, abnormality, or disorder," *id.* § 4247(a)(6); and (3) because of that condition "would have serious difficulty in refraining

from sexually violent conduct or child molestation if released." *Id.*; *see United States v. Charboneau*, 914 F.3d 906, 908 (4th Cir. 2019).

Hodge has two convictions for child-molestation offenses,[1] and he does not dispute the conclusion of all evaluating experts that he suffers from pedophilia. The parties therefore stipulated below that the first two elements of the statute were satisfied, and the hearing focused on the element of volitional control—whether Hodge's mental illness or disorder would cause him to have serious difficulty refraining from sexually violent conduct or child molestation if released.

The government presented reports and testimony from Dr. Katherine Sunder and Dr. Gary Zinik. Both experts testified that they believed Hodge would have serious difficulty refraining from reoffending if he were released and that Hodge qualified as a sexually dangerous person under the statute.

Dr. Sunder's opinion focused on Hodge's hands-on offenses, actuarial risk factors, his history of supervision violations, and his possession of risk-relevant materials in prison.[2] She testified that the existing conditions of release to which Hodge would be

---

[1]    In 1982, Hodge pleaded guilty in Virginia to aggravated sexual battery after he sexually assaulted a six-year-old boy. In 1991, Hodge pleaded guilty in Virginia to aggravated sexual battery after he performed oral sex on a nine-year-old girl. Hodge was on parole for the 1991 offense when he committed the federal child pornography offense.

[2]    Hodge was not a model prisoner during his time in federal prison. On three separate occasions in 2003, Hodge was found in possession of "risk relevant" contraband— photographs and drawings of naked children, as well as medical and other books that depicted nudity, mostly of children and adolescents. In 2007, Hodge was disciplined for possessing "child pictures and books." J.A. 456. In 2013, he was found in possession of a medical dictionary that contained pictures of female, infant, and child genitalia, and he (Continued)

3

subject if he were released were insufficient to mitigate the risk to the community. In Sunder's view, no conditions of release could be imposed that would be sufficient to mitigate the risk.

Dr. Zinik viewed Hodge's case as "quite extreme in a number of ways." J.A. 167. Zinik's analysis was based on his belief that Hodge had a preference for babies and toddlers, Hodge's lack of success while on probation and parole, the nature of his child pornography conviction, and his repeated disciplinary issues in prison. Dr. Zinik believed Hodge's repeated supervision and prison-rule violations showed that Hodge "will not cooperate with terms and conditions that are imposed upon him." J.A. 169.

Dr. Luis Rosell was appointed by the court to evaluate Hodge. In Rosell's view, Hodge would not have serious difficulty refraining from reoffending if he were to be released. Rosell focused on Hodge's age at the time of the hearing; the fact Hodge had only two hands-on offenses from decades ago; and the fact that when Hodge was in the community, he was not seeking out children or putting himself in situations where children would be found. Rosell acknowledged Hodge's possession of risk-relevant material in prison, but he did "not believe the fact that he looked at risk-relevant material while he was incarcerated increases his risk to engage in a hands-on offense." J.A. 228. Rosell testified that the existing conditions of supervised release imposed in connection with the child pornography offense would help keep Hodge accountable after release.

---

wrote five letters trying to make contact with sex offenders in the community. Other incidents occurred in 2015, 2017, 2019, and 2021. In total, Hodge attempted to obtain or was found with risk-relevant materials more than 30 times during his federal incarceration.

4

Defense expert Dr. Joseph Plaud agreed with Rosell that Hodge would not have serious difficulty refraining from reoffending if released. Plaud explained that Hodge was now 60, when sexual recidivism generally decreases, and his behavior had deescalated over time—from hands-on offenses thirty and forty years ago; to child pornography twenty years ago; and now to possession of risk-relevant items in decreasing frequency over the last five years. Although Hodge will always be a pedophile, Plaud believed that Hodge now has insight into his illness and the ability to control his behavior.

As to the Virginia parole detainer, Hodge testified that there had been no parole violation hearing. He did not know if Virginia would require him to serve a custodial sentence if he were released, but he expected that he would be sentenced to a term of between four and nine years. An employee of the Virginia Department of Corrections told Dr. Sunder in an email exchange that the Parole Board had an active warrant for Hodge and that she "presume[d] that if he completes his Federal Sentence he will have to return to" the Department of Corrections. J.A. 491.

Because Hodge's federal conviction was more than twenty years old, the conditions of supervised release imposed at the time did not include many of the conditions—such as requiring computer-tracking software—that are now standard in child pornography cases. At the conclusion of the hearing, the district court announced that it would hold the record open for twenty-one days so the parties could determine whether the sentencing court should modify the conditions and whether Hodge would agree to any such modification. The court also instructed the parties to inform the court "if something happens in prison that either side thinks is noteworthy." J.A. 356.

5

Hodge thereafter agreed to a set of modified conditions of supervised release for his pornography conviction that include numerous new conditions tailored to preventing Hodge from reoffending. Among other things, the new conditions impose restrictions on computer and internet use; require polygraph testing, mental-health and sex-offender treatment, and the use of computer monitoring software; and prohibit paid or volunteer positions involving children, the possession of pornographic material and nude images of juveniles, and traveling within 100 feet of schools, parks, and other places primarily used by children.

Hodge submitted the modified conditions to the district court, and the court directed that the information be shared with the testifying experts so they could determine whether the new information affected their opinions. The government likewise supplemented the record and provided the court with evidence of Hodge's actions since the hearing. Less than two weeks after the hearing, a search of Hodge's cell revealed a cache of material that prison officials believed to be risk-relevant, including more than 50 pages torn out of a book about the Kennedy family, which showed pictures of the Kennedys as children, and the smiling face of Little Debbie, which had apparently been cut from a box of her snacks. The district court directed that this information also be shared with the witnesses.

The supplemental evidence did not change the minds of the experts. Drs. Plaud and Rosell did not find Hodge's possession of new material to be significant enough to change their view that he does not meet the requirements for civil commitment. Dr. Plaud explained that the "materials are qualitatively of significant difference from earlier issues regarding Mr. Hodge's historic possession of risk-relevant content" and that the "hybrid

6

nature of the materials and the lack of any evidence for alteration of any of the photographic images speak more to the issue of rule following at FCI – Butner than of serious difficulty in refraining from further acts of child molestation or sexually violent conduct." J.A. 986. Dr. Rosell's analysis of the material was similar. *See* J.A. 991 ("After reviewing the content discovered in Mr. Hodge's cell, but not speaking to him for his explanation, it does not appear the content is as risk-relevant compared to previous concerning images. Therefore, at this time, my opinion has not changed regarding Mr. Hodge."). Neither Dr. Plaud nor Dr. Rosell mentioned the modified conditions of supervised release.

Drs. Zinik and Sunder believed that Hodge's decision to collect more risk-relevant material right after the hearing showed his lack of impulse control and supported their view that civil commitment was required. Neither expert believed that the modified conditions of supervision were sufficient to minimize the risk that Hodge would reoffend if released. Dr. Zinik explained:

> Given the most recent incident of possessing photos of children, Mr. Hodge demonstrates a volition impairment and indicates he would have serious difficulty refraining from molesting a child if he had the opportunity. If he can't refrain from looking at pictures of children for sexual gratification— even while incarcerated in a sex offender treatment program, even while under the microscope during his civil commitment hearing—how can he be expected to refrain from seeking contact with real children in the community? If he somehow ended up alone with a child—especially a toddler or very young child who would be unlikely to report him—how would he behave? Would he do the right thing, even if no one was watching? I don't think so.

J.A. 973; *see* J.A. 979 (Dr. Sunder's supplemental report stating that "conditions of supervision are only as good as how willing a respondent is to abide by them. While no

evaluator . . . can . . . with absolute certainty predict if a person will or will not sexually reoffend, the best indicator of future behavior is past behavior.").

By order dated January 11, 2023, the district court held that the government had established by clear and convincing evidence that Hodge met the criteria for commitment as a sexually dangerous person. In reaching that decision, the district court found that "the testimony and opinions of Sunder and Zinik are entitled to greater evidentiary weight than the opinions" of Drs. Plaud and Rosell. J.A. 403.

> They determined no set of conditions can mitigate respondent's risk sufficiently to allow for discharge to the community (even with conditions) in light of his history of sexual offending, deviant sexual interest, resistance to treatment, cognitive distortions, continued high-risk behavior, the dynamic risk factors at issue in this case, and his continued treatment needs. The court has carefully reviewed and considered the experts' reports, other documentary exhibits received into evidence, the testimony at hearing, and the parties' arguments with respect to prong three. Based on this evidence, the court finds that petitioner has satisfied its burden on prong three.

J.A. 403 (cleaned up). The district court placed significant weight on the historical aspects of the case that are not subject to change, but also recognized that there must be evidence of *ongoing* volitional impairment. As to that question, the court noted that Hodge repeatedly collected images of children and other risk-relevant materials during his federal incarceration and did so again barely a week after the hearing, which Zinik and Sunder believed showed a sexual preoccupation and the "grip strength of the underlying sexual deviance." J.A. 406. The court credited the risk-factor analyses of Zinik and Sunder, which supported a finding of volitional impairment, and concluded that a finding of volitional impairment was also supported by Hodge's repeated violations while on supervision and his refusal during most of his time in federal prison to participate in sex offender treatment.

8

The court recognized that the risk of reoffending drops significantly once offenders reach the age of 60 but concluded that, "given respondent's offense history and risk factors, . . . respondent's age alone does not support a finding of volitional control," particularly since Hodge felt compelled to collect more pictures of children just a few days after the hearing. J.A. 408-09.

The court therefore concluded that the government had shown by clear and convincing evidence that Hodge would have serious difficulty refraining from sexually violent conduct or child molestation if released, and the court ordered him committed. The district court listed the modified conditions of supervised release in its order but did not explicitly discuss the conditions or explain their effect on the court's decision. The order did not mention the Virginia parole detainer. This appeal followed.

II.

On appeal, Hodge does not directly challenge the district court's ultimate determination that he would have serious difficultly refraining from reoffending if released and that he should be committed as a sexually dangerous person. Instead, he contends that we must vacate the district court's order and remand because the district court failed to adequately consider whether the risks associated with Hodge's release would be mitigated by the restraints on his liberty that would come into play were he to be released rather than committed—the Virginia parole detainer and the modified conditions of supervision for the child pornography conviction, as required by *United States v. Williams*, 53 F.4th 825 (4th Cir. 2022).  As we will explain, we find no reversible error.

A.

9

We begin with *Williams*. While our case involves civil commitment under § 4248, *Williams* involved proceedings under 18 U.S.C. § 4246(d), which authorizes civil commitment of soon-to-be released federal prisoners who are "presently suffering from a mental disease or defect as a result of which [their] release would create a substantial risk" to the person or property of others. Defendant Williams—who was schizophrenic—was forcibly medicated with Haldol injections while in prison. The medication "psychiatrically stabilized Williams and remitted his symptoms," and Williams engaged in no further violent behavior after the injections began. *Williams*, 53 F.4th at 827 (cleaned up).

At the commitment hearing, everyone agreed that Williams posed no substantial risk to others so long as he was medicated; the question was whether Williams was likely to keep taking his medication if released. Counsel for Williams argued that the conditions of supervised release to which he would be subject if released would help to keep Williams on his medication. Counsel explained that there were "numerous conditions that directly speak" to the issues of the court's concern, *id.* at 828 (cleaned up), including requirements that Williams take all prescribed mental health medications, participate in a mental health treatment program, and allow the probation officer access to his medical information, all of which would help ensure that Williams continued the Haldol injections. The government disagreed and urged the court to ignore the conditions of supervised release altogether, suggesting it would be improper to "base our determination on the actions of another court." *Id.* (cleaned up).

The court orally granted the government's request to commit Williams at the end of the hearing. As to the terms of supervision imposed in his criminal case, the court stated:

10

The supervised release you face under your criminal judgment is of a limited duration and is subject to the control of some other court that does not have both your best interest and the mental health of you and others like you and the safety of the public, and that may be a little harsh.

Even if the Court does have that thought in mind or that goal in mind, the Court's authority to impose conditions on you is very limited. The Court is working there in the state of Oregon in the Federal United States District Court for the District of Oregon with a three-year term of supervised release. I don't know how much of that has already expired. I don't know any way at all that it can be extended.

*Id.* at 829. In the written order that followed, the district court reiterated that Williams' release would pose a danger only if he is unmedicated and acknowledged that the parties disagreed about the relevance of Williams' supervised release. The district court, however, did not resolve the disagreement, nor did the court explain whether it had considered Williams' supervised release when reaching its decision. *See id.*

On appeal, this court rejected the government's argument that the terms of supervision were not relevant and should not be considered. "Because a basic aim of a commitment analysis is to predict whether a person would pose a substantial risk to others if released, any restrictions imposed by the sentencing court—which are themselves designed to protect the public upon the person's release—are inherently relevant." *Id.* at 830 (cleaned up).

[T]he statute mandates a predictive assessment, providing commitment may be ordered only if, "after a hearing, the court finds by clear and convincing evidence that" the person's "release would create a substantial risk of bodily injury to another person or serious damage to property of another." . . . [T]his standard "requires the court to consider all the evidence presented and determine whether the person's release would endanger the public." *The statutory text does not permit—much less instruct—a commitment court to pretend that the person will not be subject to terms of supervision imposed by the sentencing court and conduct a thought experiment about whether the*

11

*same person would likely endanger others if not so constrained. Nor would such an approach afford appropriate solicitude to the serious liberty interests imposed by continuing to detain a person whose term of imprisonment has ended.*

*Id.* at 829 (cleaned up) (emphasis added).

Although *Williams* declined to "establish any hard floor for a required explanation," *id.* at 830, we concluded that the commitment court's failure to address the supervision conditions nonetheless required us to vacate and remand:

Whether or not the terms of supervision the sentencing court imposed were ultimately enough to ensure Williams' safe release, the commitment court was required to at least consider the evidence, and account for it, when concluding otherwise. . . .

Refusing to release a person who has served a criminal sentence based on a prediction that it would be too dangerous to do so is serious business. Before prolonging a person's loss of liberty. . . , courts must consider all evidence bearing on the issue, including whether and how well other preexisting restrictions on the person's conduct (including an unserved term of supervised release) could reduce the risks posed by the person's release. Because the record leaves us unable to tell whether the district court appropriately considered the terms of Williams' supervised release, we vacate the commitment order and remand for further proceedings.

*Id.* at 830, 832.

## B.

Hodge contends that the district court's analysis was insufficient under *Williams*. Although the district court listed the modified conditions of supervised release in its order, Hodge argues that the court never substantively addressed them or explained "whether and how well" the modified conditions would mitigate any risk posed by his release, as required by *Williams*. As to the Virginia parole detainer, Hodge complains that the district court did not mention it in the order, despite its relevance to the question of the risk posed by his

12

release. Hodge therefore contends that we must vacate the commitment order and remand for proper consideration by the district court of the parole detainer and conditions of supervised release.

We agree with Hodge that, although *Williams* involved proceedings under § 4246, it is likewise applicable to § 4248 proceedings, which implicate the same liberty interests and involve the same kind of predictive assessments of the risk of harm if the defendant is released. But while the district court's order could have been more fulsome, we believe the record nonetheless shows that the district court adequately considered everything that needed to be considered.

### 1. Conditions of Supervised Release

Although the district court's order did not explicitly address the effect of the modified conditions of release, it is apparent from the record that the court recognized their significance. The court directed the parties at the end of the hearing to get more information about the conditions that would be imposed and held the record open to facilitate that process. When the modified (and significantly more restrictive) conditions were submitted, the district court directed that the information be shared with the testifying experts to see if it affected their recommendations. These actions demonstrate that the district court understood the general importance of the supervision conditions to the resolution of the ultimate question of whether Hodge could safely be released.

It is likewise apparent from the record that the district court determined that the modified conditions of supervised release were inadequate to protect the community if Hodge were to be released. The district court stated that it was persuaded by the testimony

13

of Drs. Sunder and Zinik, both of whom testified that no conditions of release would be sufficient to mitigate the risk and submitted supplemental reports stating the modified conditions were still inadequate to mitigate the risk. It is true, as Hodge points out, that the district court did not expressly *adopt* the experts' analysis, but our review does not turn on quibbles over word choice. Sunder and Zinik testified that no set of conditions could adequately mitigate the risk, and the court stated that it was persuaded by their testimony. While it would have been preferable if the district court had made its analysis explicit, *Williams* declined to "establish any hard floor for a required explanation," 53 F.4th at 830, and we believe the commitment order here sufficiently illuminates the court's thought process.

Accordingly, we reject Hodge's claim that the district court failed to adequately consider the effect of the modified conditions of supervised release.

### 2. Parole Detainer

The district court noted in its order that Hodge was on parole in Virginia when he committed the federal offense, *see* J.A. 389, 407, but the court did not mention the parole detainer or the possibility that Hodge would return to state prison if he were released from federal custody. We do not believe this omission requires reversal.

*Williams* requires commitment courts to "consider all evidence bearing" on the question of dangerousness, "including whether and how well other *preexisting restrictions* on the person's conduct (including an unserved term of supervised release) could reduce the risks posed by the person's release." 53 F.4th at 832 (emphasis added). The parole detainer requires that Hodge be delivered to the Virginia Department of Corrections upon

14

his release from federal custody, and the detainer in that sense is a restriction on Hodge's conduct. But it is entirely uncertain what will happen after Hodge is returned to Virginia. Hodge could be given a custodial sentence of up to nine years, or he could again be released on parole. And if he were to be released on parole, it would be up to state officials to decide what conditions of parole should be imposed. This uncertainty makes the parole detainer very different from the conditions of supervised release at issue in *Williams*. While we know that, because of the parole detainer, Hodge will be subject to some kind of restrictions on his liberty—prison or parole—if he were to be released, we do not and cannot *now* know what form the restrictions will take. And if we do not know what the restrictions will be, it seems difficult to expect the district court to determine whether the as-yet-unknown restrictions would be sufficient to mitigate the risk of Hodge's release. Under these circumstances, we do not believe the parole detainer is the kind of "preexisting restriction" that *Williams* requires be considered and addressed.

In any event, as we have already discussed, the district court concluded that no set of conditions of supervision would be sufficient to mitigate the risks posed by Hodge's release. This factual determination renders the parole detainer largely irrelevant—after all, the district court would not have released Hodge on the hope that Virginia would return him to prison. Under these circumstances, the parole detainer in this case was not relevant to the ultimate issue, and any error by the district court in not making this analysis explicit was harmless.

15

III.

Accordingly, for the foregoing reasons, we hereby affirm the district court's order.

*AFFIRMED*